IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LORI ANN VAN BUSKIRK, | ) | CASE NO. 3:17-cv-00011 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Lori Ann Van Van Buskirk ("Plaintiff" or "Van Buskirk") seeks judicial review

of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying

her application for Disability Insurance Benefits ("DIB").  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a

Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

Van Buskirk protectively filed[1] an application for DIB on August 13, 2013.  Tr. 25, 83,

162-163.  She alleged a disability onset date of December 31, 2008 (Tr. 25, 162), and alleged

disability due to major panic attacks and high blood pressure[2] (Tr. 78, 85, 86, 93, 100, 177, 212-

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 10/31/2017).

[2] Van Buskirk alleged high blood pressure as a new condition in her request for reconsideration.  Tr. 86, 100, 212-213.

1

213).  After initial denial by the state agency (Tr.  93-95) and denial upon reconsideration (Tr.100-104), Van Buskirk requested a hearing (Tr. 105-108).  A hearing was held before Administrative Law Judge Jeffrey Hartranft ("ALJ") on February 18, 2016.  Tr. 40-77.

In his March 29, 2016, decision (Tr. 22-39), the ALJ determined that Van Buskirk had not been under a disability from December 31, 2008, through March 31, 2013, the date last insured.  Tr. 25, 34-35.  Van Buskirk requested review of the ALJ's decision by the Appeals Council.  Tr. 19-21.  On November 2, 2016, the Appeals Council denied Van Buskirk's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.        Personal, educational, and vocational evidence

Van Buskirk was born in 1958.  Tr. 47, 162.  She lives with her husband in their home. Tr. 47-48.  Her husband was not working at the time of the hearing.  Tr. 48.  He was on disability due to back problems.  Tr. 48.  Van Buskirk graduated from high school.  Tr. 48.  She started working at Dairy Queen in 2003 and last worked there in 2008.  Tr. 49, 56-57.  While working at Dairy Queen, Van Buskirk waited on customers, ran the cash register and, at times, she opened and closed the store.  Tr. 49.  The Dairy Queen that Van Buskirk worked at was open from March until November each year.  Tr. 49.  While working there, Van Buskirk's hours were 11 a.m. – 4 p.m.  Tr. 49.  Van Buskirk really enjoyed her job at Dairy Queen.  Tr. 57.  She stopped working in 2008 because the store had closed for the season.  Tr. 50.  She told management that she would return the following year if they needed her.  Tr. 50.  The owner sold the store to his son and he had hired enough employees so Van Buskirk did not return to Dairy Queen in 2009. Tr. 50.  In subsequent years, she was contacted by management at Dairy Queen to come back, most recently in 2015, but she declined.  Tr. 57.  Before working at Dairy Queen, Van Buskirk

2

worked as a home health aide.  Tr. 50.  She usually worked every day but her hours varied depending on the home care needs of each particular patient.  Tr. 50.  She stopped working as a home health aide because her vehicle became inoperable.  Tr. 50-51.

**B.    Medical evidence**[3]

**1.    Treatment records**

On March 1, 2012, Van Buskirk presented to the emergency room at Hardin Memorial Hospital in Kenton, Ohio.  Tr. 254-267, 293-306.  She complained of a dry mouth, feeling like her heart was pounding, and feeling anxious.  Tr. 254.  At the emergency room, Van Buskirk was observed to be in mild distress, anxious, and having a flat affect.  Tr. 254.  Van Buskirk was not having respiratory distress.  Tr. 254.  Van Buskirk was diagnosed with heart palpitations and a urinary tract infection.  Tr.  265-267.  Van Buskirk received prescriptions for Cipro and Xanax.  Tr. 267.

Van Buskirk received emergency medical care again on September 6, 2012.  Tr. 270-284, 307-325.  She was seen at Highland Regional Medical Center in Kentucky.  Tr. 270.  Van Buskirk complained of a panic attack that had started about 2 hours earlier.  Tr. 270.  She relayed that she had a similar episode in March which was treated in the emergency room with a prescription for Xanax.  Tr. 270.  Van Buskirk indicated that she tried to take Xanax but it did not help.  Tr. 270.  On examination, Van Buskirk was alert and observed to be in mild distress.  Tr. 271.  She was diagnosed with anxiety and discharged the same day in an improved condition with a prescription for Xanax.  Tr. 273, 276, 307.

On September 4, 2013, Van Buskirk sought non-emergency treatment for her panic attacks through primary care providers at Western Ohio Health Partners.  Tr. 286-287, 326-338.

---

[3] Plaintiff provides a very limited statement of facts section in her brief on the merits.

On September 4, 2013, Van Buskirk met with both a physician, Dr. Brian G. Cole (Tr. 326-330), and a social worker, Lisa Wagner (Tr. 331-333).  She reported fatigue, depression, anxiety, irritability, a racing heart, difficulty sleeping, and being withdrawn.  Tr. 327-328, 331.  Van Buskirk's diagnoses included major depressive disorder, recurrent, mild; anxiety; and panic disorder without agoraphobia.  Tr. 286, 329, 333.  She was prescribed citalopram (Celexa) and alprazolam (Xanax).  Tr. 286, 332.

A few weeks later, on September 18, 2013, Van Buskirk saw Ms. Wagner and Dr. Cole for follow up.  Tr. 339-346.  Van Buskirk relayed to Ms. Wagner that her sleep was poor and she was anxious about getting disability.  Tr. 339.  Van Buskirk's husband indicated that Van Buskirk had not been leaving the house very often and he was hoping that her anxiety would improve soon.  Tr. 339.  Ms. Wagner explained that it takes time for medication to work and she encouraged Van Buskirk to practice relaxation skills to help her manage her anxiety.  Tr. 340.  Ms. Wagner also encouraged Van Buskirk to pursue outpatient mental health counseling but Van Buskirk declined.  Tr. 340, 341.  Dr. Cole noted that Van Buskirk continued to report anxiety but she was needing/using less alprazolam than she had been.  Tr. 342.  Dr. Cole observed that Van Buskirk seemed calmer and less anxious than at her initial office visit.  Tr. 342.  He also noted a normal mood and appropriate affect.  Tr. 345.  Dr. Cole continued to diagnose Van Buskirk with panic disorder without agoraphobia.  Tr. 345.  He also noted diagnoses of hypertension, essential; hyperlipidemia; and impaired fasting glucose.  Tr. 345.  Dr. Cole and Ms. Wagner recommended increasing Van Buskirk's Celexa to help target Van Buskirk's anxiety and panic attacks.  Tr. 340, 346.

During an October 16, 2013, visit with Dr. Cole, Van Buskirk relayed that she was still having some agoraphobic symptoms.  Tr. 347.  She was sleeping better though and using her

4

alprazolam rarely.  Tr. 347.  She indicated that the alprazolam was more helpful for acute panic attacks at higher doses.  Tr. 347.  Van Buskirk saw Ms. Wagner the same day and relayed that she was still having panic attacks and difficulty leaving her home.  Tr. 351.  Van Buskirk indicated she was having a panic attack during her visit with Ms. Wagner.  Tr. 351.  On examination, Dr. Cole observed that Van Buskirk was somewhat tearful but her mood was normal and her affect was appropriate.  Tr. 349.  Ms. Wagner observed an anxious, flat and tearful mood.  Tr. 352.  Dr. Cole continued to diagnose panic disorder without agoraphobia and hypertension, essential.  Tr. 350.  Van Buskirk's medications were not changed since she had only started them 6 weeks earlier.  Tr. 352.  Van Buskirk declined a referral to community mental health counseling.  Tr. 352.

During a November 20, 2013, visit with Dr. Cole for follow up regarding her anxiety (Tr. 361-364), Dr. Cole noted that, although Van Buskirk's behavioral health scores remained high, she seemed much calmer and more settled than she did during her prior visit (Tr.  361).  Her sleep was better.  Tr. 361. Van Buskirk reported that she had at least two family related stressors that she felt went much better than they would have if she had not been on her current treatment. Tr. 361.  Van Buskirk reported few to no side effects and she was feeling less anhedonic.  Tr. 361.  Van Buskirk had not yet started counseling.  Tr. 361.  She indicated she wanted to wait until after the holidays.  Tr. 362.   Dr. Cole assessed panic disorder with agoraphobia but noted that Van Buskirk seemed better.  Tr. 363, 364.  Some adjustments were made to Van Buskirk's medication and Van Buskirk was encouraged to attend counseling.  Tr. 364.

Van Buskirk saw Dr. Cole (Tr. 365-368) and Ms. Wagner (Tr. 369-371) on February 26, 2014.  During her visit with Dr. Cole, Van Buskirk described her symptoms as moderate in severity.  Tr. 365.  She reported three panic attacks since her last visit – one at Thanksgiving, one

at Christmas, and one a couple of days prior to her February 26, 2014, visit.  Tr. 365.  She reported having a panic attack every time she leaves her house.  Tr. 365.  She informed Ms. Wagner that she did not feel that her anxiety was worse but she also did not feel it was much better.  Tr. 369.  She was taking alprazolam, citalopram, and dozepin.  Tr. 365.  Van Buskirk reported no improvement as a result of an increase in her citalopram.  Tr. 365.  Although referred to counseling, Van Buskirk still had not gone.  Tr. 365.  She stated she had been talking to her sister.  Tr. 365.  Dr. Cole observed that Van Buskirk's mood was anxious but her affect was appropriate.  Tr. 367.  Ms. Wagner observed that Van Buskirk was well groomed; her affect was flat; and her mood was anxious and depressed.  Tr. 369-370.  Van Buskirk was not interested in making any adjustments to her medications.  Tr.  367.  And, she was not interested in counseling due to the cost.  Tr. 367.  She was hopeful that her social stressors would be decreasing with the change in the weather and her husband's disability status.  Tr. 367, 369.

On April 9, 2014, Van Buskirk saw Dr. Cole and reported that she was feeling better, having less panic attacks, and having less anxiety.  Tr. 372.  Her sleep was stable and she no longer had concerns regarding insurance coverage.  Tr. 372.  Dr. Cole observed that Van Buskirk's mood was normal and her affect was appropriate.  Tr. 375.

The following month, on May 12, 2014, Van Buskirk saw Dr. Cole.  Tr. 377.  She described her symptoms as moderate in severity and variable depending on the day.  Tr. 377.  She felt that the alprazolam and citalopram helped.  Tr. 377.  Dr. Cole observed that Van Buskirk's mood was normal and her affect was appropriate.  Tr. 379.

On July 14, 2014, Van Buskirk saw Dr. Cole and reported that her panic attacks had decreased in numbers – she had not had a panic attack in over two weeks.  Tr. 382.  She was

singing at a nursing home three times per month for fun.  Tr. 382.  Dr. Cole observed that Van

Buskirk seemed to be doing very well at the visit.  Tr. 382.

During a September 15, 2014, visit with a social worker,[4] Van Buskirk indicated that she

was still continuing to have intermittent panic attacks but she had been able to control them fairly

well.  Tr. 386.  Ms. Wagner observed that Van Buskirk's affect was within normal limits and her

mood was euthymic.  Tr. 387.  Van Buskirk also saw Dr. Cole on September 15, 2014.  Tr. 389.

Van Buskirk relayed that she was generally doing much better but had some emerging low mood

complaints.  Tr. 389.  She was able to work outside the home now and be more active in the

community.  Tr. 389.  She was not certain that the citalopram was as helpful as it had once been.

Tr. 389.  Dr. Cole changed Van Buskirk's citalopram to venlafaxine and recommended that she

try to wean down the alprazolam.  Tr.  392.

On December 1, 2014, Van Buskirk saw Dr. Cole for a follow-up visit.  Tr. 394-397.  It

was noted that Van Buskirk was doing quite well.  Tr. 394.  Her situational anxiety and mood

issues still existed but were occurring less often.  Tr. 394.  Van Buskirk continued to be active

with karaoke at nursing homes.  Tr. 394.

On January 12, 2015, Van Buskirk saw Dr. Cole.  Tr. 398-402.  She reported having two

panic attacks since her last office visit.  Tr. 398.  Dr. Cole encouraged Van Buskirk to consider

speaking to a counselor about the underlying cause of her panic attacks.  Tr. 399.  Van Buskirk

indicated that she might talk with a counselor but she wanted to wait a month or two.  Tr. 399.

Later that month, on January 22, 2015, Van Buskirk saw Ms. Fletcher (Tr. 403-405) and Dr.

Cole (Tr. 406-410).   Van Buskirk reported that she had experienced an increase in her anxiety,

especially in social settings.  Tr. 403, 406.  She was using Xanax sparingly when she knows she

---

[4] The September 15, 2014, treatment notes list Ms. Wagner (Tr. 386) as the provider but indicate that social worker
Jane Fletcher, LISW-S signed them (Tr. 388).

will be around more people.  Tr. 403, 406.  Van Buskirk was worried about the social security disability proceedings.  Tr. 403, 406.  In March 2015 (Tr. 411-418), Van Buskirk seemed to be doing better on her current medication[5] – she was managing her anxiety more effectively (Tr. 411, 416).  She reported one panic attack since her last appointment.  Tr. 417.  Van Buskirk described her symptoms as moderate and indicated her symptoms tended to remain fairly stable during the day.  Tr. 416.  Ms. Fletcher observed that Van Buskirk was well groomed and cooperative but her affect was flat and her mood was anxious and depressed.  Tr. 417.  Van Buskirk did not want to increase her medication.  Tr. 417.  She felt she had been able to utilize coping skills to reduce her anxiety.  Tr. 417.

During a May 11, 2015, visit with Dr. Cole (Tr. 420-423), Van Buskirk reported that her mood was stable but she was mildly more anxious since she was resuming her nursing home volunteer activities.  Tr. 420.  Her sleep was stable.  Tr. 420.  In July 2015 (Tr. 424-431), Van Buskirk reported more anxiety relating to situational and familial stressors.  Tr. 424, 429.  She was having difficulty sleeping.  Tr. 424, 429.  Van Buskirk was less agoraphobic and rarely using alprazolam.  Tr. 424.  Dr. Cole added Remeron to Van Buskirk's medications to help with her sleep.  Tr. 427, 430.

On September 21, 2015, Van Buskirk saw Dr. Cole and Ms. Fletcher.  Tr. 437-445.  Van Buskirk was continuing to have symptoms but her anxiety had improved slightly.  Tr. 437, 442.  She reported that she had been able to go to the store on her own without experiencing a panic attack.  Tr. 437.  Her sleep was variable but the Remeron was helping. Tr. 437, 442.  Her primary concern was her irritability.  Tr. 437.  Van Buskirk's Effexor was increased to address her irritability.  Tr. 438.

---

[5] Effexor had been added to Van Buskirk's medications, with an increase in the dose being made during Van Buskirk's January 22, 2015, visit.  Tr. 404.

8

On November 13, 2015, Van Buskirk saw Dr. Cole and Ms. Fletcher for follow up.  Tr. 446-453.  Van Buskirk reported that her situational stressors had increased since her prior visit and her anxiety was worse.  Tr. 446-447, 451.  She was not sleeping well.  Tr. 447.  She lost her insurance and her sister was diagnosed with cancer.  Tr. 447, 451.  Van Buskirk was frustrated with the length of time her social security disability case was taking.  Tr. 451.  Van Buskirk described her symptoms as moderate, indicating they tended to be worse at bedtime.  Tr. 451.  Van Buskirk's Remeron was adjusted to help with her sleep.  Tr. 452.  Ms. Fletcher provided Van Buskirk with information regarding ongoing counseling services.  Tr. 452.  Van Buskirk indicated that she was interested in going to counseling.  Tr. 452.

In December 2015, Van Buskirk continued to report situational stressors, e.g., the holiday season, financial concerns, and waiting for disability hearing.  Tr. 454, 458.  She was still having problems sleeping but she was having less panic symptoms.  Tr. 454, 458.  Van Buskirk was hopeful that her stressors would improve over the upcoming months.  Tr. 455.  No changes were made to Van Buskirk's medication.  Tr. 455.

Shortly before her administrative hearing, Van Buskirk saw Dr. Cole and Ms. Fletcher on February 8, 2016.  Tr. 463-471.  Van Buskirk reported an increase in her anxiety over the prior weeks and intermittent panic attacks.  Tr. 463, 468.  Van Buskirk indicated that, overall, her mood had been more stable on Effexor but she had been quite anxious about her upcoming disability hearing.  Tr. 463.  Van Buskirk was seeing mild improvement in her sleep pattern.  Tr. 468.  No changes were made to Van Buskirk's medication since she was reporting satisfactory results.  Tr. 464. Ms. Fletcher discussed relaxation techniques to help Van Buskirk cope with her impending disability hearing.  Tr. 465.

9

## 2.      Opinion evidence

*Treating source*

On November 16, 2015, Ms. Fletcher completed a Mental Residual Functional Capacity

Assessment.  Tr. 354-358.   The Assessment was signed by both Ms. Fletcher and Dr. Cole.  Tr.

358.  The Assessment reflects that treatment started in September 2013, with the most recent

appointment occurring on November 13, 2015.  Tr. 355.  Van Buskirk's diagnoses were listed as

generalized anxiety disorder; major depression, recurrent; borderline personality disorder;

hypertension; and GERD.  Tr. 355.  Financial stressors and loss of medical insurance were also

listed as concerns.  Tr. 355.  Van Buskirk's current GAF was 51[6] and her highest GAF in the

past year was 65.[7]  Tr. 355.  Van Buskirk's prognosis was fair.  Tr. 355.  When asked whether

there were any physical medical conditions that might contribute to Van Buskirk's mental

impairment, Ms. Fletcher and Dr. Cole responded "no."  Tr. 355.  They indicated that Van

Buskirk's impairment had lasted, or was expected to last, at least 12 months.  Tr. 355.  Ms.

Fletcher and Dr. Cole did not believe that Van Buskirk was a malingerer and they indicated she

was compliant with her treatment.  Tr. 355-356.

---

[6] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013  ("DSM-5"), at 16.

[7] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR, at 34.

Ms. Fletcher and Dr. Cole were asked to describe Van Buskirk's functional abilities using the following definitions: (1) "none," meaning there are no limitations on the ability to function in the area; (2) "mild," meaning there are limitations on ability to function but they are mild or transient, (3) "moderate," meaning the ability to function in the area is less than marked but more than mild, (4) "marked," meaning the ability to function in the area is seriously limited, (5) "extreme," meaning the ability to function in the area is precluded, and (6) "not ratable," meaning there is no evidence available to rate the ability to function in the area.  Tr. 356.

In the area of understanding and memory, Ms. Fletcher and Dr. Cole found no limitations in Van Buskirk's ability to remember work-like procedures or in her ability to understand and remember very short and simple instructions.  Tr. 356.  They found mild limitations in Van Buskirk's ability to understand and remember detailed instructions.  Tr. 356.

In the area of sustained concentration and persistence, Ms. Fletcher and Dr. Cole found no limitations in Van Buskirk's ability to carry out very short and simple instructions and ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  Tr. 356.  They found mild limitations in Van Buskirk's ability to sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and make simple work-related decisions.  Tr. 357.  They found moderate limitations in Van Buskirk's ability to carry out detailed instructions.  Tr. 356.  They found marked limitations in Van Buskirk's ability to maintain attention and concentration for extended periods and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods.  Tr. 356.

11

In the area of social interaction, Ms. Fletcher and Dr. Cole found mild limitations in Van Buskirk's ability to ask simple questions or request assistance.  Tr. 357.  They found moderate limitations in Van Buskirk's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Tr. 357.  They found marked limitations in Van Buskirk's ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 357.

In the area of adaptation, Ms. Fletcher and Dr. Cole found no limitations in Van Buskirk's ability to be aware of normal hazards and take appropriate precautions.  Tr. 358.  They found moderate limitations in Van Buskirk's ability to set realistic goals or makes plans independently of others.  Tr. 358.  The found marked limitations in Van Buskirk's ability to respond appropriately to changes in the work setting.  Tr. 357.  They found extreme limitations in Van Buskirk's ability to travel in unfamiliar places or use public transportation and ability to tolerate normal levels of stress.  Tr. 358.

Ms. Fletcher and Dr. Cole also opined that Van Buskirk's impairment would substantially interfere with her ability to work on a regular and sustained basis at least 20% of the time.  Tr. 358.  They opined that Van Buskirk would need to miss work approximately 10 days per month because of her mental impairment or treatment for her mental impairment.  Tr. 358.  Also, they opined that, in light of her mental impairment, Van Buskirk was unable to work on a regular and sustained basis.  Tr. 358.

*Reviewing psychologists*

State agency reviewing psychologist Leslie Rudy, Ph.D., concluded on September 10, 2013, that there was insufficient medical evidence to evaluate Van Buskirk for the period

December 31, 2008, the alleged onset date, through March 31, 2013, the date last insured.  Tr. 81.  Upon reconsideration, on December 10, 2013, state agency reviewing psychologist Bruce Goldsmith, Ph.D., agreed that there was insufficient evidence.  Tr. 89-90.

**C.**     **Hearing testimony**

    **1.**     **Plaintiff's testimony**

Van Buskirk testified and was represented at the hearing.  Tr. 46-67, 73-77.  She indicated that her mental health problems started in 2012.  Tr. 52.  She was not having any physical problems during 2012 and 2013 and she was not diagnosed with diabetes until 2014 or 2015.  Tr. 64, 67.

Van Buskirk explained that, in 2012, she learned that her sister and husband had had an affair and had a child together.  Tr. 52.  After learning that information, Van Buskirk did not want to leave her home and, in March 2012, she had a panic attack.  Tr. 52-55, 59.  She sought emergency room treatment because she thought she was having a heart attack.  Tr. 55, 59.  She was diagnosed with a panic attack and sent home with medication.  Tr. 55.  She had a second panic attack in September 2012 when she was in Kentucky for sightseeing.  Tr. 55, 59.  She then had another panic attack in June 2013 when she was on a vacation in Myrtle Beach.  Tr. 55, 60. Van Buskirk's son had paid for the Myrtle Beach vacation for her and her husband.  Tr. 60. They were supposed to be in Myrtle Beach for four days.  Tr. 60.  However, because of her panic attack, they returned home after two days.  Tr. 60.  She did not seek emergency treatment while in Myrtle Beach because she had enough medicine to take so she was able to make the return trip home.  Tr. 60.  When Van Buskirk started having panic attacks, she kind of "blew it off" for about the first year because chances were she would not have any more.  Tr. 64.  However, she continued to have panic attacks and felt like "a prisoner in [her] own home."  Tr. 64.

Her panic attacks last anywhere from 15-20 minutes.  Tr. 56.  Van Buskirk indicated she now has panic attacks at least 2-3 times each month.  Tr. 54.  She indicated that nothing specific triggers her panic attacks.  Tr. 54.  She gets really hot, sweaty, and tingly and her body feels like it is on fire.  Tr. 54, 59.  In addition to her panic attacks, Van Buskirk was also having crying spells in 2012 and prior to March 2013.  Tr. 62.  She could manage to go somewhere if she knew she would not be gone for a very long time.  Tr. 53.  As an example, Van Buskirk explained that her family would go to a nursing home to sing karaoke for the residents.  Tr. 53.  The visits usually lasted about an hour.  Tr. 53.  Following an hour long visit, Van Buskirk would be ready to go home.  Tr. 53.  Because she does not want to be around people, her husband usually does all the grocery shopping.  Tr. 63.  She has gone shopping with her husband but, as soon as she gets in the store, she starts getting hot and sweaty and has to go home.  Tr. 63.  She did not attend funerals for an aunt and an uncle.  Tr. 63.  Van Buskirk indicated she also has problems concentrating.  Tr. 64.  She will forget that she has put food on the stove or she will forget that she has put clothes in the dryer.  Tr. 64.  At some point, more recently than 2012 and 2013, Van Buskirk stopped caring about taking care of herself.  Tr. 62-63.  Her husband has had to remind her to take a shower.  Tr. 62-63.

Van Buskirk has tried to make peace with her sister for the sake of their mother.  Tr. 54, 62.  Van Buskirk noted that her sister was diagnosed with cancer in 2015.  Tr. 54-55.

Until September 2013, Van Buskirk sought treatment for her panic attacks through emergency rooms because of a lack of insurance.  Tr. 61.  In September 2013, a clinic opened near her home in Kenton and she started counseling.  Tr. 52-53, 61.  She was prescribed antidepressants and alprazolam.  Tr. 52-53.  Van Buskirk did not feel that her medication was

helpful.  Tr. 53.  Also, she did not feel that talking about the situation with her sister and husband
with her psychologist was helpful.  Tr. 53.

Van Buskirk explained that she does not think she could return to her job at Dairy Queen
because she does not want to be closed in or around other people and she would not be able to
perform her job if she were to have a panic attack at work.  Tr. 57-58, 66.  Also, she does not
want to embarrass anyone if she were to have a panic attack while at work.  Tr. 57-58.   Van
Buskirk also does not think she could perform the home health aide position because the job
would require driving and she does not want to drive.  Tr. 58.  Van Buskirk has a driver's license
but she generally does not drive because she does not know when she might have a panic attack.
Tr. 48, 58-59.  Her husband drives her where she needs to go.  Tr. 48, 58.  Van Buskirk last
drove about two months prior to the hearing when she drove her granddaughter to a playground
that was about two blocks from her home.  Tr. 58.

## 2.        Vocational expert's testimony

Vocational Expert Mr. Hartung ("VE") testified at the hearing.  Tr. 67-73.  The VE
described Van Buskirk's past work, indicating her past work at Dairy Queen was that of a fast
food worker, an unskilled, light level job, and she also worked as a home attendant, a
semiskilled, medium level job.  Tr. 68.

The ALJ first asked the VE whether Van Buskirk would be able to perform either of her
past jobs if she was capable of working at all exertional levels; capable of performing simple,
work-related decisions with few, if any, workplace changes; and capable of carrying out work
that does not have strict production quotas or require fast-paced work such as on an assembly
line.  Tr. 68.  The VE indicated that the fast food worker job would remain.  Tr. 68.   The ALJ
then asked the VE to assume a hypothetical individual with Van Buskirk's educational and

vocational background along with the restrictions previously stated and asked the VE whether the VE could identify medium exertional level jobs for the described individual.  Tr. 68.  The VE identified the following medium, unskilled jobs – laboratory equipment cleaner, sexton (janitorial position performed in churches), and kitchen helper.  Tr. 68-69.  The VE provided state and national job incidence data for each of the identified jobs.  Tr. 69.

The ALJ asked the VE whether his answer would change if the described individual was also limited to working in positions that required only occasional interaction with the general public, coworkers, and supervisors.  Tr. 69.  The VE indicated that Van Buskirk's past work could not be performed with that additional limitation but the three other jobs identified could be performed.  Tr. 69-70.  The ALJ then asked the VE whether his answer would change if the described individual's ability to interact with the general public was reduced from occasional interaction with the public to no interaction with the public.  Tr. 70.  The VE stated that his prior responses would not change.  Tr. 70.

In response to further questioning by the ALJ, the VE indicated that, if the hypothetical individual would have two or more unexcused absences per month, there would be no work available because that level of absenteeism falls above the acceptable level of absenteeism for an average employer.  Tr. 70.  Also, if the individual would only be able to complete 6 hours out of an 8-hour workday, twice a month, there would be no jobs available.  Tr. 70.  And, if the individual would be off task 10% of the workday, in addition to customary breaks, due to a panic attack or fear of having a panic attack, there would be no jobs available.  Tr. 70, 72-73.

Van Buskirk's counsel asked the VE whether there would be jobs available if the hypothetical individual described by the ALJ could have only superficial contact with coworkers and supervisors.  Tr. 71.  The VE indicated that such a limitation would not preclude unskilled

16

work. Tr. 71.  However, if the individual would be precluded from have any contact, i.e., would be required to work in isolation, the VE indicated that such a limitation would be work preclusive.  Tr. 71.  Also, if the described individual required an additional break in the morning and afternoon, the VE stated that such a limitation would be work preclusive.  Tr. 71-72.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

17

the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S.

Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV. The ALJ's Decision

In his March 29, 2016, decision, the ALJ made the following findings:[8]

1.     Van Buskirk met the insured status requirements through March 31, 2013. Tr. 27.

2.     Van Buskirk did not engage in substantial gainful activity during the period from her alleged onset date of December 31, 2008, through her date last insured of March 31, 2013.  Tr. 27.

3.     Through the date last insured, Van Buskirk had the following severe impairments: an anxiety disorder, a panic disorder, and a depressive disorder.  Tr. 27.

4.     Through the date last insured, Van Buskirk did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 27-29.

5.     Through the date last insured, Van Buskirk had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: She could perform simple, routine, and repetitive tasks involving only simple work related decisions with few if any workplace

---

[8] The ALJ's findings are summarized.

changes, no strict production quotas or fast-paced work such as on an assembly line, and only occasional interaction with the public, coworkers, and supervisors. Tr. 29-33.

6.    Through the date last insured, Van Buskirk was unable to perform any past relevant work. Tr. 33.

7.    Van Buskirk was born in 1958 and was 54 years old, defined as an individual closely approaching advanced age, on the date last insured. Tr. 33.

8.    Van Buskirk has at least a high school education and is able to communicate in English. Tr. 33.

9.    Transferability of job skills was not material to the determination of disability. Tr. 34.

10.   Through the date last insured, considering Van Buskirk's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Van Buskirk could perform, including laboratory equipment cleaner, sexton, and kitchen helper. Tr. 34.

Based on the foregoing, the ALJ determined that Van Buskirk was not under a disability at any time form December 31, 2008, the alleged onset date, through March 31, 2013, the date last insured. Tr. 34-35.

## V. Parties' Arguments

Van Buskirk argues that the ALJ's weighing of the opinion of her treating therapist and psychiatrist was contrary to the requirements of the treating physician rule. Doc. 13, pp. 3-4. Next, Van Buskirk argues that the RFC is not supported by substantial evidence because the ALJ ignored evidence supporting physical limitations. Doc. 13, pp. 4-5. Last, Van Buskirk argues that the ALJ failed to fully develop the record. Doc. 13, pp. 5-6.

In response, the Commissioner argues that the ALJ properly considered the opinion evidence, did not err at Step Two, the ALJ's RFC is supported by substantial evidence, and the ALJ did not fail to fully develop the record. Doc. 14, pp. 7-15.

19

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

### A.      The ALJ properly weighed Van Buskirk's treating sources' opinion

Van Buskirk contends that the ALJ erred by not properly evaluating the November 16, 2015, opinion of Ms. Fletcher and Dr. Cole.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

In order to prove her DIB claim, Van Buskirk is required to establish disability on or before March 31, 2013, her date last insured.  "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2004) (citing *Cornett v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264, n. 6 (6th Cir, 1988)); *see also Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d

21

918, 920 (6th Cir. 1987)(finding evidence obtained after date last insured only minimally probative of claimant's condition prior to date last insured and rejecting claimant's argument that the ALJ's rejection of medical opinion was not supported by substantial evidence).  Additionally, medical evidence after the date last insured is relevant only when the evidence "relates back" to the claimant's limitations prior to the date last insured.  *Walton v. Astrue*, 773 F.Supp.2d 742, 750 (N.D. Ohio 2011) (citation omitted) (sentence six remand analysis); *see also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (later dated medical evidence is to be considered to the extent it sheds light on claimant's condition during the operative time period) ; *Jones v. Comm'r of Soc. Sec.*, 121 F.3d 708, * 1 (6th Cir. 1997) (unpublished) ("Evidence relating to a later time period is only minimally probative, and is only considered to the extent it illuminates a claimant's health before the expiration of his or her insured status.") (internal citations omitted).

Although the bulk of the medical evidence regarding Van Buskirk's mental impairment post-dated Van Buskirk's date last insured, the ALJ considered it, including the November 16, 2015, opinion rendered by Ms. Fletcher and Dr. Cole.  Tr. 30-33.  In considering the opinion rendered by Ms. Fletcher and Dr. Cole, the ALJ stated:

> The claimant's therapist provided a mental functional capacity assessment, co-signed by the claimant's psychiatrist, in which she endorsed marked limitation in multiple functional areas, including marked limitation of her ability to maintain attention and concentration for extended periods, to complete a normal workday or work week, to interact appropriately with the public, to respond to criticism, or to get along with peers (Exhibit 9F). The therapist endorsed extreme limitation of the claimant's ability to tolerate normal levels of stress (Id.). She opined that the claimant could not work on a regular and sustained basis due to her mental impairments and that she would need to miss work about 10 times per month for treatment (Id., at 5). She endorsed a current GAF score of 51 with a highest GAF score over the past year of 65 (Id., at 2). The assessment was dated November 16, 2015 and indicated that she last saw the claimant on November 13, 2015.
>
> I gave this assessment little weight because the therapist's treatment records, including the notes dated November 13, 2015, consistently state that the claimant's symptoms were moderate, which is inconsistent with marked and extreme

limitation (See Exhibit 1lF/35). Further, the claimant did not begin counseling with the therapist until October 2013, after the date last insured of March 2013, and the counselor did not indicate that the assessed limitations were applicable to the period prior to the date last insured. In fact, the claimant did not seek mental health care (with the exception of two emergency department visits) until September 2013, well after the date last insured and the alleged onset date. Finally, the treatment notes consistently document symptom improvement with medication and treatment. I considered the GAF scores noted in the opinion, but gave them little weight because GAF scores were not noted in the treatment records maintained during regular office visits and because GAF scores represent a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time. The research on GAF scores shows very little predictive validity; therefore, they do not provide a reliable longitudinal picture of the claimant's mental functioning and are not entitled to great weight.

Tr. 31-32.

Van Buskirk claims that the ALJ failed to properly weigh the opinion because he failed to consider the length of the treatment relationship, the nature and extent of the treatment relationship and the provider's specialization and, instead, only found that the treatment notes were inconsistent with the opinion of Ms. Fletcher and Dr. Cole that Van Buskirk was incapable of work.  Doc. 13, p. 4.  The undersigned finds Van Buskirk's treating physician argument to be without merit.

Here, in accordance with the treating physician rule and applicable regulations, the ALJ properly considered whether the opinion was consistent with other evidence of record.  Van Buskirk does not dispute that treatment records reflected only moderate symptoms and it is not for this Court to reweigh the evidence.  Furthermore, the ALJ did consider the nature and extent of the treatment relationship.  The ALJ noted when the treatment relationship started and discussed in detail the treatment notes from 2013 through 2015.  Tr. 31-32.  Additionally, the ALJ observed that treatment with Dr. Cole and Ms. Fletcher did not begin until after Van Buskirk's date last insured and their opinion did not indicate that the assessed limitations were applicable to the period prior to Van Buskirk's date last insured.

23

Considering the foregoing, the undersigned finds that the ALJ's weighing of the opinion of Ms. Fletcher and Dr. Cole was more than sufficient to satisfy the treating physician rule. Thus, the undersigned recommends that the Court find no error with respect to the ALJ's consideration and weighing of the opinion of Ms. Fletcher and Dr. Cole.

**B.     The ALJ's RFC is supported by substantial evidence**

Van Buskirk argues that the RFC is not supported by substantial evidence because the ALJ ignored evidence supporting physical limitations.  Doc. 13, pp. 4-5.  She asserts that the ALJ erred by not concluding that her hypertension, GERD and diabetes were severe impairments; by finding no functional limitations stemming from hypertension, GERD, or diabetes; by not considering that she was an individual closely approaching advanced age as of the date last insured, and by not considering limitations stemming from her prior back and right knee surgeries and/or a carpal tunnel diagnosis.  Doc. 13, pp. 4-5.

Initially, the undersigned observes that the ALJ did consider that Van Buskirk was an individual closely approaching advanced age at the date last insured.  Tr. 33, finding 7. Moreover, Van Buskirk's own testimony and statements made on her behalf during the hearing are in clear conflict with her claim that she has limitations stemming from physical impairments and that the ALJ erred by not including RFC limitations stemming from physical impairments. For example, the ALJ asked Van Buskirk about her physical problems and, in response, Van Buskirk stated that she was not having <u>any</u> physical problems in 2012 and 2013.  Tr. 67.  She also indicated that she was not diagnosed with diabetes until 2014 or 2015, after her date last insured.  Tr. 64.  Additionally, during opening argument, Van Buskirk's attorney stated, "the panic attacks and the depression and the anxiety is what took her out of the workplace."  Tr. 45;

*see also* Tr. 46 (". . . like I stated, the panic attacks, depression and anxiety is what made her stop working, unfortunately.").

In light of these statements, Van Buskirk has not demonstrated that the ALJ erred in failing to find severe physical impairments and/or in failing to include physical limitations in the RFC.  Additionally, as indicated in *Higgs v. Bowen,* 880 F.2d 860 (6th Cir.1988), a diagnosis alone "says nothing about the severity of the condition."  *Id.* at 863.  Van Buskirk has not identified specific physical limitations nor has she submitted any evidence to support limitations stemming from her alleged physical impairments during the relevant period.

Considering the foregoing, the undersigned recommends that the Court find that the ALJ did not err in evaluating Van Buskirk's alleged physical impairments and reject Van Buskirk's claim that the RFC is not supported by substantial evidence.

**C.      The ALJ did not err in his duty to fully develop the record**

Van Buskirk argues that that the ALJ failed to fully develop the record.  Doc. 13, pp. 5-6. She asserts that, because there was a lack of medical evidence prior to her date last insured and there were no functional opinions from state agency reviewing psychologists due to there being "insufficient evidence prior to the date last insured," the ALJ erred by failing to have her examined by a consultative examiner and/or by failing to question her regarding her physical symptoms.  Doc. 13, pp. 5-6.

An ALJ has an obligation to ensure "that every claimant receives a full and fair hearing[.]" *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1052 (6th Cir. 1983). Nevertheless, a "claimant bears the ultimate burden of proving disability." *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008).  Furthermore, an ALJ has a special, heightened duty to develop the record <u>only</u> under special circumstances, such as "when a

claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with the hearing procedures[.]" *Wilson*, 280 Fed. Appx. at 459 (citing *Lashley*, 708 F.2d at 1051-1052). Further, "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Sec'y of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. § 416.917, which states "If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we <u>may</u> ask you to have one or more physical or mental examinations or tests.") (emphasis supplied).

In this case, Van Buskirk has not shown the existence of special circumstances warranting a finding that the ALJ was under a heightened duty to develop the record. She was represented by counsel in the administrative proceedings as of November 14, 2013. Tr. 98. Furthermore, at the administrative level, neither Van Buskirk nor her attorney suggested that further development of the record was necessary. For instance, at the hearing, Van Buskirk's attorney indicated that, other than additional records submitted on the day of the hearing, there was no additional evidence for submission into the claim file. Tr. 42.

Also, as indicated above, an ALJ is not required to order a consultative examination. *Landsaw*, 803 F.2d at 214. It is within the ALJ's discretion "to determine whether further evidence, such as additional testimony or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). Here the ALJ evaluated the medical and other evidence submitted by Van Buskirk, including the opinion evidence from her own treating sources, and determined that she was not disabled prior to her date last insured. Although the state agency reviewing psychologists concluded that there was insufficient evidence to evaluate the claim, Van Buskirk

26

has not shown that a consultative examination and/or further development of the record regarding her physical symptoms was necessary, especially considering her own testimony that she did not have physical problems in 2012 or 2013.  *See* Tr. 67.

Based on the foregoing, the undersigned recommends that the Court reject Van Buskirk's claim that the ALJ failed to fully develop the record.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

October 31, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).